IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **ALEX D. JONES,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | Civil Action No.  3:11-CV-3416-M (BH) |
| | § | |
| **MICHAEL J. ASTRUE,** | § | |
| **COMMISSIONER OF THE SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| | § | |
| **Defendant.** | § | |

**<u>FINDINGS, CONCLUSIONS, AND RECOMMENDATION</u>**
**<u>OF THE UNITED STATES MAGISTRATE JUDGE</u>**

Pursuant to *Special Order No. 3-251*, this case was automatically referred for findings of fact and recommendation.  Before the Court are *Plaintiff's Motion for Summary Judgment*, filed February 23, 2012 (doc. 18) and *Defendant's Motion for Summary Judgment*, filed March 26, 2012 (doc. 21).  Based on the relevant filings, evidence, and applicable law, Plaintiff's motion should be **GRANTED**, Defendant's motion should be **DENIED**, and the case should be **REMANDED** to the Commissioner for further proceedings.

## I. BACKGROUND[1]

### A.  <u>Procedural History</u>

Alex D. Jones (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying his claim for supplemental security income under Title XVI of the Social Security Act.  (R. at 14–23.)  On March 26, 2008, Plaintiff applied for supplemental

---

[1]   The background information comes from the record of the administrative proceedings, which is designated as "R."

income benefits under Title XVI of the Social Security Act, alleging disability due to diabetes and leg pain, beginning June 1, 2005.  (R. at 14, 211, 215, 232.)  His application was denied initially and upon reconsideration.  (R. at 14.)  He timely requested a hearing before an Administrative Law Judge (ALJ) and personally appeared and testified at a hearing held on August 17, 2009.  (R. at 14, 28–49.)  On October 23, 2009, the ALJ issued her decision finding Plaintiff not disabled.  (R. at 86–92.)  Upon his request for review of the ALJ's decision, the Appeals Council remanded his claim for a new hearing and decision on December 11, 2009.  (R. at 97–98.)  He appeared and testified at a second hearing held on March 23, 2010.  (R. at 50–80.)  On June 16, 2010, the ALJ issued her second decision finding Plaintiff not disabled.  (R. at 14–23.)   The Appeals Council denied his request for review on October 12, 2011, making the ALJ's decision the final decision of the Commissioner.  (R. at 1–5.)  He timely appealed to the United States District Court pursuant to 42 U.S.C. § 405(g).  (doc. 18.)

**B.**     **Factual History**

  **1.**     **Age, Education, and Work Experience**

Plaintiff was born on September 10, 1964. (R. at 81.)  At the time of the hearing before the ALJ, he was 46 years old.  (R. at 57.)  He completed the 12th grade and did not attend vocational school or college.  (*Id.*)  His past relevant work is as a fast food cook.  (R. at 76.)

  **2.**     **Medical, Psychological, and Psychiatric Evidence**

   *a.*     *Medical Evidence*

On July 28, 2005, Plaintiff presented to Charlton Methodist Hospital Emergency Room (Charlton Methodist) complaining of pain and swelling in his right ankle after he "jumped off a dock" two weeks earlier.  (R. at 452–56.)  X-rays revealed "heterotopic bone formation ... anterior

to distal talus, erosion of distal talus, no fractures, [and] soft tissue swelling." (R. at 456.) Mary-Ann Iskander, P.A., the examining physician, diagnosed him with a sprained ankle and discharged him with instructions to avoid vigorous physical activity, apply ice packs, and use crutches and pain medication as needed. (R. at 455.)

On August 11, 2005, Plaintiff returned to Charlton Methodist for pain from a splinter in his right ring finger. (R. at 430, 450.) X-rays of his right hand revealed "irregular loss of bone along the tip of the distal phalanx of the thumb, which appear[ed] to be chronic," but "no radio-distinct foreign body" or "acute fracture or dislocation" was found. (R. at 450.) He was awake, alert, oriented, and in "no apparent distress." (R. at 445.) Dr. Iskander diagnosed him with cellulitis of the skin (wound abscess), drained the abscess, and prescribed him antibiotics. (R. at 443, 449.)

An ultrasound of Plaintiff's right leg taken two days later showed that his veins "were readily compressible and [had] appropriate augmentation," and he had "[s]ubcutaneous soft tissue edema ... in the ankle region." (R. at 443.) The final impression was "[n]egative for deep venous thrombosis." (Id.) That day, Jeffrey D. Hopkins, M.D., also diagnosed him with "hyperglycemia" and referred him to his family physician. (R. at 430–31.)

Plaintiff returned the following month for pain in his hip. (R. at 418–28.) X-rays of his pelvis revealed "a single orthopedic screw ... [from] [an] old trauma" and no acute fracture was found. (R. at 428.)

On February 1, 2006, Michael V. Passamante, M.D., a physician at Charlton Methodist, diagnosed Plaintiff with "uncontrolled diabetes mellitus" and drained a wound abscess in his right upper arm. (R. at 401–10.) On November 11, 2006, he was treated for a diabetic foot ulcer. (R. at 398.) X-rays of his right foot revealed "fracturing and destructive changes of the middle and distal

- 3 -

phalanges of the second toe," "asymmetric early blood flow ... [and] distribution within the soft tissues," "marked abnormal accumulation of tracer within the right mid-foot," and "marked abnormal accumulation within the region of the navicular, worrisome for chronic osteomyelitis." (R. at 396, 398.)

On November 15, 2006, Frank J. Vittimberga, M.D., at Charlton Methodist, diagnosed Plaintiff with right foot osteomyelitis and opined that his second toe would probably require amputation. (R. at 390–91.) The next day, Plaintiff told Dr. Vittimberga that he was "feeling better" and did not "feel he need[ed] [an] amputation and would like a [second] opinion." (R. at 393.) Dr. Vittimberga prescribed a six-week course of daily antibiotic injections and discharged him on November 18, 2006, with instructions to resume normal activity as tolerated, keep his toe covered, take his prescribed medications, and return in two weeks for a follow-up consultation. (*Id.*) From November 19, 2006 to January 19, 2007, Plaintiff received daily injections of Invantz antibiotics. (R. at 310–66.)

On January 23, 2007, X-ray impressions of his foot showed "extreme swelling" around his toe, the "middle phalanx" was "partially destroyed," and a "Charcot joint involving the intertarsal bones" was apparent. (R. at 497.)

Plaintiff was examined for an alleged injury to his rib on March 16, 2007. (R. at 304.) X-rays of his chest indicated that his heart was "normal in size, [his] lungs [were] clear," and there was "no evidence of infiltrates, effusions, or pneumothoraces." (R. at 298.) During the consultation, he was awake, alert, and oriented and he showed no apparent distress. (R. at 291.)

On September 20, 2007, Plaintiff presented to Parkland Hospital Emergency Room (Parkland) complaining of back, neck, and shoulder pain. (R. at 491.) He told Leonard Berry, M.D.,

- 4 -

the examining physician, that he had last taken his blood pressure medications two months earlier. (R. at 491.) Dr. Berry determined that his uncontrolled diabetes was "due to poor compliance with [his] med[ications]." (R. at 492.) He prescribed him medication and referred him to a "diabetic [nutrition] clinic." (R. at 493.)

On May 15, 2008, Orlando Terneny, M.D., a consulting physician with disability determination services, examined Plaintiff and completed an internal medicine evaluation. (R. at 459–62.) His primary diagnoses were diabetes mellitus and leg pain. (R. at 459.) Plaintiff told Dr. Terneny he was diagnosed with diabetes in 1999 and was currently "experienc[ing] numbness and tingling in his upper extremities, mostly in his fingers." (*Id.*) He reported smoking seven cigarettes a day and drinking about two beers a day. (*Id.*) Dr. Terneny found "evidence of diabetic peripheral neuropathy with numbness and tingling in the lower extremities associated with cramps, electric discharges, as well as restless legs and progressive weakness of both legs." (*Id.*)

Dr. Terneny noted Plaintiff's complaints of pain in his legs, lower back, right hip, and both knees, and found that he was unable to squat or bend, walk on his tip toes or heels, walk more than a quarter of a block, or stand still for more than two or three minutes. (*Id.*) He had a "full range of motion except at the level of the knees in which there [was] evidence of crepitation, pain, and decreased range of motion." (R. at 460.) His cranial nerve and cerebral function were intact, he had "good, fine finger control to dextrous movement," and did not appear to be in distress. (R. at 461.) Plaintiff's deep tendon reflexes were "almost absent in the lower extremities," his sensation to pinprick and position was "decreased in the lower extremities," and on a five-point scale, his muscle strength was three in his lower extremities and four in his upper extremities. (*Id.*) Dr. Terneny's final impressions were: diabetes mellitus with end organ damage as well as diabetic retinopathy,

diabetic peripheral neuropathy, evidence of discogenic disease "probably associated with degenerative joint disease and radicular pain to both legs, more severe in the right than in the left," and evidence of degenerative joint disease in both knees and his right hip.  (*Id.*)

On June 5, 2008, Jimmy Breazeale, M.D., a state agency medical consultant (SAMC) completed a Physical Residual Functional Capacity (RFC) assessment. (R. at 467–74.) He opined that Plaintiff had the physical RFC to: lift 20 pounds occasionally and 10 pounds frequently; stand and walk for at least two hours in an eight-hour workday; sit (with normal breaks) for about six hours in an eight-hour workday; push and pull an unlimited amount of weight with hand and foot controls; and no postural, manipulative, visual, communicative, or environmental limitations.  (R. at 468–71.)  He reviewed Plaintiff's medical records and noted he had bilateral hip surgery and a "normal physical exam" in March 2007.  (R. at 469.)  He referenced Dr. Terneny's consultative observations that Plaintiff had a normal gait, complained of pain and had a decreased range of motion in both knees, had venous stasis and pitting edema and erythema in an early state of ulceration in both of his legs, had decreased sensation and strength in his extremities, and had "moderated osteoarthritis."  (*Id.*)

On July 7, 2008, Plaintiff presented to Parkland Hospital Bluitt Flowers Clinic (Bluitt Flowers) for a routine check-up and medication refill.  (R. at 476.)  Linda Lomax, LVN, diagnosed him with diabetes, neuropathy, and hyperlipidemia, and noted his "tobacco abuse" and "poor medical compliance." (R. at 477.)  She prescribed him medication and advised him to stop smoking. (*Id.*)  He returned on October 20, 2008, complaining of blurred vision, pain in his legs, and numbness in his feet.  (R. at 488.)  Dr. Lomax prescribed him eye drops, changed his medications, and referred him to an optometrist.  (R. at 489–90.)

On January 6, 2009, Plaintiff returned to Bluitt Flowers to follow-up with his diabetes and neuropathy. (R. at 485.) He weighed 315.6 pounds, had elevated blood pressure, and complained of decreased sensation in his feet. (*Id.*) Shawna Tatum, LVN, prescribed him medications, referred him to a dietician and podiatry, and ordered a "thyroid scan." (R. at 484, 486.) Two days later, Dalerie Wilkerson, M.D., a podiatrist, treated him for infected toe nails. (R. at 531–33.) She noted that he was "not taking any med[ications] for [his] neuropathy" and prescribed him medication for his infected toe nails and dry skin. (R. at 531, 533.) He subsequently underwent a thyroid test that revealed "slightly increased uptake of the thyroid gland consistent with mild hyperthyroidism." (R. at 529.) Dr. Tatum advised him to "follow up with [his] primary care physician to determine whether or not ablative therapy [was] required." (*Id.*)

On April 16, 2009, Dina Alhazim, M.D., a Bluitt Flowers physician, examined Plaintiff for pain in his legs that he rated as an eight on a ten-point scale. (R. at 538.) On August 28, 2009, he was seen again for numbness in both legs and feet. (R. at 594–608, 659–76.) He told Dr. Alhazim that his blood sugar usually ranged between 300 and 400 but sometimes dropped to 67 or 68 and made him dizzy. (R. at 660.) A physical examination was normal, and he was alert and oriented, appeared well-developed and well-nourished, and had a normal range of motion. (*Id.*) Dr. Alhazim instructed him to decrease his medication dosage in the evening and to increase it in the morning, gave him information about the "2000 calorie diabetic diet" and diabetes, and advised him to attend nutrition and smoking-cessation classes offered at Parkland. (R. at 660–76.)

On September 29, 2009, Plaintiff underwent a "nutrition initial assessment" at Bluitt Flowers Nutrition Clinic. (R. at 591, 877.) His height was six feet, four inches, he weighed 310 pounds, his Body Mass Index (BMI) was 37.73, and his obesity grade was II. (R. at 877–78.) The nutritionist

noted that he "blame[d] everyone but himself for [his] uncontrolled diabetes" and his "comprehension of [the] information discussed [was] poor based on [his] responses to questions and self-care/control of [his] diabetes." (R. at 878.)

On October 27, 2009, Plaintiff underwent another nutritional assessment. (R. at 548, 753–68, 872–76.) He weighed 307 pounds, his BMI was 37.37, and his "obesity grade [level was] II." (R. at 548.) He reported eating more vegetables and fruits and less fried food, drinking less soda and more water, eating baked, boiled, and grilled meats, and walking for exercise once a week for 20 or 30 minutes. (R. at 753–54.) The nutritionist noted: "great job on changes made in your eating habits; please continue." (R. at 753) The nutritionist opined that his progress toward making positive diet and lifestyle changes was merely "fair" due to his "inactive lifestyle," "his responses to questions, and [his] motivation in making behavior changes." (R. at 874.) The nutritionist also advised him to lose weight by walking four days a week for ten minutes and noted that he continued to smoke. (R. at 875.)

On December 4, 2009, Plaintiff presented to Bluitt Flowers for a routine check-up. (R. at 562, 697–702, 918.) He was doing "fine" and doing "lots of walking" "to put feeling back into [his] feet." (R. at 697.) He complained of "on/off blurriness" and reported being out of medications for a week. (*Id.*) Jeffrey L. Hulstein, M.D., diagnosed him with high cholesterol, hypertension, and diabetes, and advised him to refill his medications regularly, check his blood sugar level twice daily, stop smoking, walk or exercise when possible, and attend a nutrition evaluation in January. (R. at 697–98.)

On January 29, 2010, Plaintiff told Dr. Hulstein that he tried taking all his medications as prescribed but had run out six weeks before "due to finances." (R. at 914.) He reported that the day

- 8 -

before his blood sugar was a "high" 489 and complained again of blurred vision. (*Id.*) Dr. Hulstein refilled his medications. (R. at 915.) He returned the following month complaining of "decreased visual acuity." (R. at 565–78, 735–744.) Dr. Alhazim diagnosed him with hyperlipidemia, diabetes mellitus (uncontrolled, type II), neuropathy, hypertension, and vision impairment. (R. at 566.) She prescribed him medication and referred him to Bluitt Flowers Optometry for an eye exam. (R. at 566–67.) He returned two days later for a follow-up and to complete his disability application. (R. at 546–47, 903–05.) Joseph T. Pinion, LVN noted: "I do think that he wants to take care of his [diabetes], but it looks like, after 7 [appointments], he does not understand the complexity of his disease and the need of multi-disciplinary team to help [with] controlling [his blood sugar]." (R. at 903.) Dr. Pinion advised him to see a lawyer for his disability application and recommended that he attend a smoking cessation class, but Plaintiff "declined [the] class." (*Id.*) During a routine check-ups on March 20 and 29, 2010, he told physicians he was compliant with all his medications. (R. at 633, 900–02.)

On April 7, 2010, Dr. Hulstein examined Plaintiff for body aches that had been on-going for 10 days and a sore throat that prevented him from swallowing. (R. at 965–67.) Dr. Hulstein discussed the importance of taking his insulin and Metformin daily and refilling his medications consistently. (R. at 968.) Nasrin Safari, M.D., a physician at Bluitt Flowers, treated him the next day for pharyngitis and a pharyngeal abscess. (R. at 976.) Dr. Safari observed large swelling in his throat and inflammation in his right tonsil. (*Id.*) He told Dr. Safari that he had the abscess drained at Charlton Methodist but he could not afford the medication they prescribed him "due to [the] price." (*Id.*) Dr. Safari referred him to "SW for financial assistance", where they supplied "all of his medicine" for a "small co-pay." (*Id.*) During a follow-up consultation, he complained of pain

from his strep throat infection and again reporting having blurry vision. (R. at 984.) Dr. Safari concluded that his blood sugar was still uncontrolled, but his pharyngitis was improving, and he referred him to an optometrist. (R. at 987–88.)

On February 28, 2011, Plaintiff underwent an eye examination at Bluitt Flowers Optometry. (R. at 993.) He told Cheryl Principe Lopez, O.D., the optometrist, that his last eye exam was on November 17, 2008 and he had experienced "decreased vision" for the past year. (R. at 997–98.) Dr. Principe Lopez advised him to control his blood sugar, explaining that "increased blood sugar leads to decreased best corrected visual acuity." (R. at 998.) She diagnosed him with vitreous hemorrhage of his left eye, proliferative diabetic retinopathy, tractional detachment of the retina in both eyes, and "other and combined forms of senile cataract." (R. at 999.) She referred him to an ophthalmologist and instructed him to present to the emergency room if his retina detached or he experienced other "acute changes." (R. at 1000.)

On March 7, 2011, Plaintiff received "laser treatment" for his eyes at Parkland Ophthalmology Clinic. (R. at 1004–17.) Jordon George Lubahn, M.D., the ophthalmologist, noted that he "did not take any medications [that] morning" and advised him to control his blood pressure and blood sugar. (R. at 1005–07.) Dr. Lubahn's notes reflect that Plaintiff "left before [the] treatment [was] completed." (R. at 1007.) By March 14, 2011, he was still experiencing an "eyelid problem" on his left eye. (R. at 1015.) Because the laser treatment was "complicated by [his] anxiety and pain," Dr. Lubahn recommended that he take "Lortab" prior to the next treatment. (R. at 1019.) Dr. Lubahn also found an abscess in his leg and referred him to urgent care for immediate treatment. (*Id.*) His final diagnoses were proliferative diabetic retinopathy, vitreous hemorrhage, diabetic macular edema, and diabetes mellitus, eye manifestation, type II. (R. at 1020.)

On April 11, 2011, Plaintiff returned to Bluitt Flowers complaining of lower back pain, rating eight on a ten-point scale and right knee pain rating nine. (R. at 1028, 1032.) Dr. Alhazim found that he was oriented to person, place, and time, exhibited no apparent distress, had a normal range of motion in his neck, had a normal heart rate and rhythm, exhibited no edema, and was not diaphoretic. (R. at 1032.) She diagnosed him with diabetes mellitus, type II, uncontrolled, with neurologic manifestation; neuropathy, other and unspecified hyperlipidemia; hypertension; right knee pain; depressive disorder; back pain; mononeuritis; and joint and lower leg and lower back pain. (R. at 1033.)

On May 16, 2011, Plaintiff was admitted to Charlton Methodist for surgery for an abscess in his throat. (R. at 1079.) The surgeon, Muhammad H. Hassanein, M.D., found that his "wound cultures [tested] positive for strep and anaerobes" and he had "persistent fevers in spite of being on antibiotics ... and increasing white blood cell count." (*Id.*) He diagnosed him with acute, chronic anemia "requiring blood transfusions, likely secondary to chronic kidney disease and iron deficiency"; acute kidney injury on chronic kidney disease; accelerated hypertension; uncontrolled type II diabetes; hypoalbuminemia; morbid obesity and severe deconditioning; and urinary retention, likely secondary to benign prostatic hypertrophy. (*Id.*) Dr. Hassanein also noted that he was "noncompliant with [his] medical therapy." (*Id.*) A CT scan of his pelvis "was negative for acute loculated fluid collections, [but was] positive for diffuse lymphadenopathy." (*Id.*) "He remained hemodynamically stable, ... his renal function improved significantly," and his "blood sugars [were] optimally controlled." (*Id.*) On May 27, 2011, Dr. Hassanein "discussed with [him] and his wife ... [his] worsening leukocytosis" but "they insisted on [his] discharge home ... with prescriptions for antibiotics and hydrocodone." (*Id.*) Dr. Hassanein discharged him with instructions to follow up

at Parkland "for further care and wound care management."  (R. at 1079–80.)

> ### b.   *Psychological and Psychiatric Evidence*

On October 20, 2008, Plaintiff presented to Metrocare Services (Metrocare) for a "psychiatric diagnostic interview exam." (R. at 522–24.) Sapril Nguyen, the treating psychologist, discussed "his need to get some balance in his life," as he "primarily [sat] around the house thinking of his problems." (R. at 522.) He told Dr. Nguyen that he did not "have a job or nothing to do" and he needed to "do something different because [he] [got] depressed living how [he] live[d] [then]." (*Id.*) Dr. Nguyen found that he was poorly dressed, displayed apathy, and "seem[ed] to be primarily focused on getting his disability." (*Id.*)

On November 4, 2008, during a counseling session at Metrocare, Plaintiff learned about "find[ing] solutions to his problems," which were "mainly [his] lack of health care and ... income." (R. at 515–20.) Ben Murphy, a Metrocare Clinician, helped him identify "some possible solutions" for his problems and educated him on problem solving skills. (R. at 519.) Plaintiff acknowledged his need to "increase his level of activity," "attend to his physical healthcare needs," "help out more around the house to increase his sense of belonging and self worth," and "accept responsibility for change." (*Id.*) He was alert and oriented and his speech and memory were "intact." (R. at 516.) He complained of increased depression, sleeping "not too good," agitation, irritability, mood swings, "being tiresome and stress[ed]," and "spending his time doing 'nothing' and 'watching TV.'" (*Id.*) He told Mr. Murphy that he had suffered from depression for nine years due to his diabetes and other medical problems, he had a "very low energy level," and he had experienced auditory hallucinations "all the time" since 2006. (R. at 515.) His wife and mother reported that he became "easily agitated." (*Id.*)

On November 10, 2008, Dr. Nguyen assigned Plaintiff a Global Assessment of Functioning (GAF) score of 42[2] and diagnosed him with major depressive disorder with psychotic features.  (R. at 526.)  Plaintiff told Dr. Nguyen that he could not "get a job because he [could] not stand for a long period of time."  (*Id.*)  Dr. Nguyen opined that he "appear[ed] to be motivated to some extent by secondary gain but appear[ed] to exhibit symptoms of depression and possibly a manic episode."  (*Id.*)  She prescribed him Zoloft, Tegretol, and Trazodone for his depression and insomnia.  (*Id.*)

On December 1, 2008, Plaintiff returned to Metrocare accompanied by his wife and mother.  (R. at 512.)  Dr. Nguyen found that he was alert and oriented and his speech and memory were "intact."  (*Id.*)  Although his depression was a "little bit better," he was still "sleeping not so good" and experiencing dizziness from his medications; he had feelings of hopelessness, agitation, irritability, mood swings, and "g[o]t mad for no reason."  (*Id.*)  His mother reported that "his blood sugars [had] been as low as 56" and he "did not get [his] labs done."  (*Id.*)

On December 19, 2008, Plaintiff participated in a "medication management" session with Dr. Nguyen.  (R. at 507.)  He stated he was being compliant with his medications and had noted a "slight improvement" with his depression.  (R. at 508.)  He was still paranoid and "still stressing real bad" from his diabetes and family problems.  (*Id.*)  During another medication management session on January 15, 2009, he told the clinician that he had been diagnosed with depression at Charlton Methodist but had never received anti-depressant therapy.  (R. at 501.)

On February 1, 2010, Dr. Nguyen diagnosed Plaintiff with major depressive disorder without psychotic features and assigned him a GAF of 45.  (R. at 953, 955.)  Plaintiff reported "little

---

[2]  A GAF score of 41 to 50 indicates serious symptoms, such as suicidal ideations, or "any serious impairment in social, occupational, or school functioning."  *See* Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders*, 34 (4th ed., text rev. 2000).

improvement" with his insomnia, and she discontinued his Trazadone "due to inefficacy", prescribed him Restoril, and advised him to continue taking Benadryl.  (R. at 953.)  She also increased his dosage of Zoloft from 50 to 100 milligrams.  (*Id.*)  He showed no indication of suicidal or homicidal thoughts and did not appear to be in significant distress, and he had no psychiatric-related hospitalizations in the past 180 days or substance abuse.  (R. at 955.)  She recommended 18 routine counseling sessions, 12 sessions of medication training and support, and 27 skills training and development sessions.  (R. at 956.)

On April 5, 2010, Plaintiff told Dr. Nguyen that he had lost nine pounds since his last visit and was compliant with his medications.  (R. at 1072.)  He reported little improvement with insomnia, as he still had "difficulty going back to sleep" and "some depression."  (*Id.*)  Dr. Nguyen found that he was adequately groomed, cooperative, alert, and oriented; his thoughts were organized; his memory was intact; his attention, psychomotor activity, and speech were normal; and his insight, judgment, and impulse were fair.  (*Id.*)

On May 14, 2010, Plaintiff had an individual counseling session on "pharmacological management."  (R. at 1067.)  Metrocare clinician Quazi Imam found him to be "non-compliant in taking [the] medication prescribed."  (*Id.*)  He was adequately groomed, alert, oriented, and cooperative; had normal psychomotor activity and speech; his thoughts were organized; and he showed no signs of psychotic features.  (*Id.*)  He was experiencing "severe hypertension" and agreed to "go to [his] family physician immediately" after the session.  (*Id.*)  He failed to show up for counseling sessions on June 16 and 21, 2010.  (R. at 1064–65.)

On July 26, 2010, Plaintiff had an individual "skills training session" at Metrocare.  (R. at 1058.)  The objectives were to learn "life management skills," including "stress management,

coping skills, daily activities, life balance, social skills, goal setting, and problem solving skills."
(*Id.*)  He complained to Latarshua Pickens, the clinician: "I just do not understand why the social
security people will not give me any money, it just does not make any sense." (*Id.*)  He told her that
he lived with his mother, was married, had no children, had no current income, had applied for
disability benefits and was denied six times.  (*Id.*)  He was previously incarcerated, did not abuse
drugs or alcohol, and had the following health problems:  pins in his hip, breathing complications,
trouble with bending and lifting items, diabetes, high blood pressure, neuropathy, and poor
circulation in his legs and feet.  (*Id.*)  He had his wife's support and his real life goal was "to get
better." (*Id.*)  Ms. Pickens opined that he lacked "effective stress management skills" and concluded
that his progress was "fair."  (R. at 1059.)  Among his barriers were depression, lack of income,
stress, anger, and poor symptom management.  (*Id.*)

Ms. Pickens noted that Plaintiff's physical appearance was unkempt; he was cooperative,
alert, and oriented, and showed no anxieties or signs of psychotic features; had normal attention,
psychomotor activity, and speech; his thoughts were goal-oriented; and his insight, judgment, and
impulse were fair.  (R. at 1060–61.)  He agreed to take his medications as prescribed and to attend
his counseling sessions.  (R. at 1061.)  Ms. Pickens gave him a list of social security attorneys and
referred him to Parkland to "follow-up with his current health problems." (R. at 1059.)  He did not
show up for counseling sessions on October 22, 2010, and December 23, 2010.  (R. at 1055–56.)

On January 25, 2011, Plaintiff presented for a "skills training session" at Metrocare.  (R. at
1050.)  Clinician Natasha Simmons instructed him on managing clinical depression, including
symptomology and medication management.  (*Id.*)  He spoke with a calm tone of voice and was
focused throughout the session.  (*Id.*)  He was alert and cooperative, had normal psychomotor

activity and speech, his thoughts were goal-oriented, his affect was restricted, and he showed no signs of psychotic features. (R. at 1051.) He did show signs of depression, sadness, and paranoia, and reported sleeping only two hours a night. (R. at 1052.)

On March 2, 2011, Plaintiff told Ms. Simmons he was "hearing voices daily" and that the episodes lasted about 15 seconds. (R. at 1047.) She diagnosed him with paranoia and found that he was adequately groomed and cooperative, his thoughts were goal-oriented, he had normal psychomotor activity and speech; his memory was intact, he had fair insight, judgment, and impulse, and he showed no anxieties. (R. at 1047–48.). The following month, he underwent a psycho-social screening evaluation. (R. at 1037.) He reported being worried, stressed, and sad, and he had problems with housing, finances, transportation, his legal situation, coping with pain and his poor health, and dealing with family members. (*Id.*)

On June 8, 2011, Gretchen Megowen, M.D., a Metrocare psychiatrist, diagnosed Plaintiff with major depressive disorder with psychotic features and completed a "medical assessment of ability to perform work-related mental activities." (R. at 1075–77.) She opined that he had "some loss of ability" in applying common sense to understand and carry out simple one or two-step instructions, maintaining attendance and being punctual within customary tolerances, acting appropriately with the general public, and getting along with co-workers without unduly distracting them or exhibiting behavioral extremes. (R. at 1075–76.) She opined that he had a "substantial loss of ability to perform" six mental activities in regular, competitive employment, including applying common sense to understand and carry out detailed but involved instructions, maintaining concentration for two hours, making simple work-related decisions, and responding appropriately to changes in a routine work setting. (*Id.*) She opined that he had an "extreme loss of ability to

- 16 -

perform" six mental activities, including staying on task for two hours, performing at a consistent pace without an unreasonable number and length of rest periods, and the ability to accept instructions and respond appropriately to criticism from supervisors.  (*Id.*)

Dr. Megowen assigned Plaintiff a GAF score of 45 and indicated that his mental disorder was characterized by symptoms such as low energy, difficulty thinking, chronic depression, sleep disturbance, and psychomotor agitation and retardation.  (R. at 1076.)  She opined that his disorder or symptoms would cause him more than four absences from work a month and indicated that they "exacerbated the degree of disability" he experienced from his physical impairments.  (R. at 1077.)  Lastly, she opined that his physical condition "ha[d] continued to gradually deteriorate."  (*Id.*)

On June 8, 2011, during Plaintiff's last "pharmacological management" session at Metrocare on file, he told Dr. Megowen that he "just [had] a hard time finding the energy to do much of anything", and he continued hearing "voices that distrac[ted] [him] much of the time."  (R. at 1085.)  Although he reported "psychosis," he had no delusions, his thoughts were goal-oriented, he was alert and oriented, he had no anxieties, his memory was intact, and his insight, judgment, and impulse were "fair."  (R. at 1086.)  Dr. Megowen concluded that he needed counseling sessions on managing his "ongoing illness, education and coping skills, and self care."  (R. at 1088.)

### 3.    Hearing Testimony

On March 23, 2010, Plaintiff, his wife, and a vocational expert testified at a hearing before the ALJ.  (R. at 50–80.)  Plaintiff was represented by an attorney.  (*See id.*)

#### a.    *Plaintiff's Testimony*

Plaintiff testified that he was 46 years old, married, had a 12th grade education, and was living with his mother and his wife.  (R. at 57.)  He could read and write and perform simple math,

was left-handed, and had not worked since June 10, 2008. (R. at 57–58.) Before that date, he worked at Church's Chicken as a cook for about one year. (R. at 58.) Prior to that, he worked for a moving company and "AFC Enterprises," a fried chicken restaurant. (*Id.*) He stopped working at AFC because his "diabetes was messing with [him]," his blood "sugar level was out of control," he "was dizzy at all times" from his medications, and "when [he] tried to go to work [he] was just dropping chicken pans." (R. at 59.) He sometimes could bathe, groom, and dress on his own. (*Id.*) Due to his diabetes, he had trouble putting on his socks; he could not bend over because his "back was hurting … real bad," and his leg also "bother[ed] [him] real bad." (*Id.*) He sometimes tried "to do something around the house, … like tak[ing] out the trash" or cleaning his room. (*Id.*)

Plaintiff took his diabetes medications as prescribed but they were just "not strong enough." (*Id.*) He sometimes ran out of medicine because he didn't "have funding for paying for [it]." (*Id.*) Although he knew he should not smoke, he was still smoking cigarettes that his friends and family gave him. (*Id.*) He stopped drinking beer "a long time ago." (R. at 61.) He went "to [his] diabetic class" and tried to keep his diet under control, but he didn't "have the right food" and could not eat the proper diet. (*Id.*) He sometimes walked for exercise but could not walk very far—"maybe a half a block or not even that much"— he did not walk "too often." (R. at 61–62.) Although he tried to keep his weight under control, he had "been gaining more than losing." (R. at 62.) He currently weighed around 310 pounds and was six feet, four inches tall. (*Id.*)

On a typical day, Plaintiff got up, showered, got dressed, drank a cup of coffee, and watched television. (R. at 63.) He watched CNN and other news channels to "try to keep up with what's going on." (*Id.*) He also liked to "watch a few movies," such as soap opera movies. (*Id.*) He sometimes drove. (*Id.*) He slept for only two or three hours at night and did not take naps during

the day.  (R. at 62–63.)

Plaintiff went to Metrocare "pretty consistently," "every two or three weeks," to treat his depression.  (R. at 64.)  He took Trazodone 130 milligrams for sleep but it did not help.  (R. at 65.)  On a bad day, he felt "a little stressed out, depressed, suicidal, depressed, [and] upset all the time."  (*Id.*)  "[J]ust about almost every day" was a bad day.  (*Id.*)

In response to counsel's question, Plaintiff testified that he worked security jobs where he had to "walk the premises."  (R. at 66.)  He did not attend college or a vocational school after high school.  (*Id.*)  He was left-handed and had difficulty using his hands because he would "get numbness in [his] hands a lot, [got] a lot of tingling," and "sometime[s] it [felt] … funny, just real numb."  (*Id.*)  He could not even sense whether a can of soda was hot or cold.  (R. at 67.)  He could not pick up or manipulate very small objects.  (*Id.*)

After Plaintiff stopped working, he did not collect any long or short-term disability or unemployment benefits.  (*Id.*)  When he worked as a cook, he was always on his feet.  (*Id.*)  In an eight-hour workday, he did not think he could currently stand all eight hours.  (R. at 68.)  He could not even stand or sit for six hours because his legs and hips would "start hurting."  (*Id.*)  He could not do a lot of things, including a job where he was allowed to "do some sitting and some standing", and he could not be in the same room for an entire eight-hour workday.  (*Id.*)  He just could not think of any job that he would be able to do.  (*Id.*)  He could only lift 30 pounds at the waist level because his back hurt; he could not bend either forward or backward.  (R. at 69–70.)

Plaintiff could not do grocery shopping; he tried to cook but could not do it as often as he used to.  (R. at 70.)  He liked to eat sandwiches and chips.  (*Id.*)  He did not think he could drive a shuttle bus or cab because he could not sit or drive for 40 hours a week.  (*Id.*)  His eye-sight was not

very good, and he even was unable to read the notice about his hearing.  (R. at 71.)  He had an eye

exam at Bluitt Flowers.  (*Id.*)  The pain in his legs and feet was the most severe, and the pain in his

fingers and hip was second in severity.  (*Id.*)  On an average day, the pain in his legs and feet was

about eight and a half on a ten-point scale.  (*Id.*)  He had problems with his memory and had to be

reminded when to take his medicine.  (*Id.*)  His energy level and motivation were not very good, and

he had difficulty finishing tasks on time.  (*Id.*)  His mom paid his bills.  (*Id.*)

> **b.**     ***Wife's Testimony***

Plaintiff's wife also testified at the hearing.  (R. at 73.)  She testified that they had known

each other for about 13 or 14 years and were married in 2000.  (*Id.*)  Over the past two years, his

health had deteriorated due to his diabetes, and she had to help him "keep track of his blood sugar

readings."  (R. at 73–74.)  The typical reading was "about like 340 sometimes" but could get as high

as "550."  (R. at 74.)  It could be as low as 38, and he even lost consciousness at times.  (*Id.*)  He

could not afford his medications.  (*Id.*)

On an average day, Plaintiff got up, checked his blood sugar "to see if it's high or low," took

his insulin, and "walked around" or watched television.  (*Id.*)  On a bad day, he did not get out of

bed because he was in pain and had been "up all night, all the time of the night."  (*Id.*)  His

depression changed his attitude; he got upset over "[e]very little thing" that she did not consider to

"be that crucial."  (R. at 75.)  His depression was "real bad," and the doctors said that his diabetes

caused "him to have mood swings because it [was not] under control."  (*Id.*)  At times, he was

suicidal, "like he [did not] want to live anymore."  (*Id.*)  He was "eating a diabetic diet" and did not

sit around and eat chips because they did not "even buy chips."  (*Id.*)  Although Plaintiff had

testified that he could not buy the right food for his diabetic diet, he at least avoided sweets "like

peppermints or ... orange juice." (R. at 76.) He left the house "to get some fresh air, but not a lot." (*Id.*) He still smoked sometimes, but he had stopped drinking alcohol about six months earlier. (*Id.*)

### c.      *Vocational Expert Testimony*

A vocational expert (VE) also testified at the hearing. (R. at 76–79.) The VE testified that Plaintiff's past relevant work history was as a fast food cook (medium, SVP-5). (R. at 76.) The ALJ asked the VE to opine whether a hypothetical person of Plaintiff's age, education, and work experience could perform his past relevant work with the following limitations: lift up to 50 pounds occasionally and 25 pounds frequently; sit or stand as an option, i.e., jobs that could be performed either sitting or standing; stand and walk for up to four hours a day; sit for up to six hours; never climb ropes, ladders, or scaffolds; and occasional postural maneuvers. (R. at 77.) The VE testified that the hypothetical person could not perform Plaintiff's past relevant work but could perform other work in the competitive economy, including parking lot cashier (light, SVP-2), with 1,100 jobs in Texas and 21,000 jobs in the national economy, counter clerk (light, SVP-2), with 1,000 jobs in Texas and 18,500 in the national economy, and photocopy machine operator (light, SVP-2), with 1,200 jobs in Texas and 17,200 jobs in the national economy. (*Id.*)

When the ALJ modified the hypothetical to include a mental restriction to "simple work," the VE opined that the hypothetical person could still perform those jobs. (*Id.*) The ALJ modified the hypothetical again to limit handling, fingering, and sensing to "frequent," and the VE opined that the parking lot cashier position would be eliminated, but the person could still perform the jobs of counter clerk and photocopy machine operator. (*Id.*) The VE explained that a counter clerk worked at a counter, such as a "photo counter at something such as at Wal-Mart [or] Eckerd's." (R. at 78.) The VE testified that with the additional restrictions, the hypothetical person could also perform the

job of an information clerk (light, SVP-2), with 2,100 jobs in Texas and 35,000 jobs in the national

economy.  (*Id.*)  The ALJ then added the following restrictions: lift 20 pounds occasionally and 10

pounds frequently; stand and walk for up to two hours a day; sit for six hours a day; have one minute

stretch breaks at 30 minute intervals; all the other "non-exertionals"; never climb ropes, ladders, or

scaffolds; occasional postural maneuvers; frequent handling, fingering, and sensing; and limited to

simple work.  (*Id.*)  The VE opined that the hypothetical person could perform the jobs of order clerk

(sedentary, SVP-2), with 1,500 jobs in Texas and 26,000 in the national economy, addresser

(sedentary, SVP-2), with 1,200 jobs in Texas and 24,000 in the national economy, and call-out

operator (sedentary, SVP-2), with 1,100 jobs in Texas and 17,000 in the national economy.  (*Id.*)

Lastly, the VE opined that the hypothetical person could not maintain competitive employment if

he "had to lie down during the day."  (R. at 78–79.)

Upon examination by counsel, the VE opined that the "near acuity," i.e. the person's ability

to see within two feet, for the sedentary jobs she listed would be "frequent," and the depth

perception, color, and field of vision "would be negligible."  (R. at 79.)

**C.**     **ALJ's Findings**

The ALJ issued her decision denying benefits on June 16, 2010.  (R. at 14–23.)  At step one,

the ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged onset

date of March 26, 2008.  (R. at 16.)  At step two, she determined that Plaintiff had three severe

impairments: diabetic neuropathy, obesity, and depression.  (*Id.*)  Despite those impairments, at step

three, she found that no impairment or combination of impairments satisfied the criteria of any

impairment listed in the social security regulations.  (R. 17–18).  The ALJ next determined that

Plaintiff retained the physical RFC to perform work at the medium exertional level, as defined in

20 C.F.R. § 416.967(c), with the following limitations: stand and walk for four of eight hours; sit

for six of eight hours with a sit-stand option; never climb ropes, ladders or scaffolds; occasionally

climb ramps and stairs; occasionally balance, stoop, kneel, crouch, and crawl; and frequently handle,

finger, and sense with his upper extremities.   (R. at 18.)   She limited his mental RFC to

"understanding, remembering, and carrying out simple work."   (*Id.*)   At step four, the ALJ

determined that Plaintiff could not perform his past relevant work as a fast food cook.   (R. at 21.)

At step five, with the testimony of the VE, she determined that there were jobs existing in significant

numbers in the national economy that he could perform, such as counter clerk, with 1,000 jobs in

Texas and 18,500 in the national economy; photocopy machine operator, with 1,200 jobs in Texas

and 17,200 in the national economy; and information clerk, with 2,100 jobs in Texas and 35,000 in

the national economy.   (R. at 22.)   Accordingly, she determined that Plaintiff was not disabled

within the meaning of the Social Security Act at any time between his alleged onset date of March

26, 2008, and the date of her decision.   (R. at 23.)

## II.  ANALYSIS

### A.  <u>Legal Standards</u>

#### 1.  Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to whether the

Commissioner's position is supported by substantial evidence and whether the Commissioner

applied proper legal standards in evaluating the evidence.   42 U.S.C. § 405(g), 1383(C)(3);

*Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).   Substantial evidence is defined as more

than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a

reasonable mind might accept as adequate to support a conclusion.   *Leggett v. Chater*, 67 F.3d 558,

564 (5th Cir. 1995).  In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present.  *Greenspan*, 38 F.3d at 236.  A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision.  *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program.  *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985).  Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income.  *See id*.  The Court may rely on decisions in both areas, without distinction, when reviewing an ALJ's decision.  *See id*.

## 2.    Disability Determination

To be entitled to social security benefits, a claimant must prove he or she is disabled as defined by the Social Security Act.  *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988).  The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1.    An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.    An individual who does not have a "severe impairment" will not be found to be disabled.

3.    An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.    If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.    If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (per curiam) (summarizing 20 C.F.R. § 404.1520(b)-(f)) (currently 20 C.F.R. § 404.1520(a)(4)(i)-(v) (2012)).  Under the first four steps of the analysis, the burden lies with the claimant to prove disability.  *Leggett*, 67 F.3d at 564.  The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled.  *Id.*  Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show there is other gainful employment available in the national economy that the claimant is capable of performing.  *Greenspan*, 38 F.3d at 236.  This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations, by vocational expert testimony, or other similar evidence.  *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).  A finding that a claimant is not disabled at any point in the review is conclusive and terminates the analysis.  *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

B.     **Issues for Review**

Plaintiff presents the following issues for review:

(1)     The ALJ failed to apply the appropriate legal standard established by the Fifth Circuit Court of Appeals in deciding which of Plaintiff's impairments are severe at Step 2 of the Sequential Analysis;[3]

(2)     The hypothetical question to the VE did not reasonably incorporate all disabilities of the claimant recognized by the ALJ;[4]

(3)     The ALJ's RFC is fatally flawed.  The RFC is not based on substantial evidence; and the ALJ failed to perform a function-by-function assessment; and the RFC violates the mandate rule;

(4)     The ALJ failed to follow the dictates of the remand order in that (a) the Plaintiff's obesity was not properly considered; (b) the ALJ failed to identify and resolve any conflicts between the occupational evidence provided by the VE and the DOT before accepting the testimony of the VE, as required by [the] remand order; [and]

(5)     The ALJ did not comply with Social Security Rulings in making the implicit determination that Plaintiff's non-compliance with medical treatment precludes disability.

(Pl. Br. at 1.)

C.     **RFC Determination**

Plaintiff essentially argues that the ALJ's RFC determination is "fatally flawed" and "is not based on substantial evidence" in part because "the ALJ failed to perform a function-by-function assessment" before determining his mental RFC.  (Pl. Br. at 21–24.)

Residual functional capacity, or RFC, is defined as the most that a person can still do despite

---

[3] Although Plaintiff's appears to initially raise *Stone* error based on the definition of "severity" employed by the ALJ at step two, the "three errors" that he briefs in support of this issue are either entirely unrelated to *Stone* or are subsumed within other issues, such as his argument that the ALJ misapplied the psychiatric review technique.

[4] Although listed second, Plaintiff's issue regarding the ALJ's hypothetical to the VE implicates steps four and five, which follow the RFC assessment in the sequential evaluation process.  Accordingly, the Court first addresses Plaintiff's third issue regarding the RFC assessment.

recognized limitations.  20 C.F.R. § 404.1545(a)(1) (2003).  It "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis."  Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996).  An individual's RFC should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources.  20 C.F.R. § 404.1545(a)(3) (2012); SSR 96-8p, 1996 WL 374184, at *1.

The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity."  *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985).  The ALJ may find that a claimant has no limitation or restriction as to a functional capacity when there is no allegation of a physical or mental limitation or restriction regarding that capacity, and no information in the record indicates that such a limitation or restriction exists.  *See* SSR 96-8p, 1996 WL 374184, at *1.  The ALJ's RFC decision can be supported by substantial evidence even if she does not specifically discuss all the evidence that supports her decision or all the evidence that she rejected.  *Falco v. Shalala*, 27 F.3d 16, 164 (5th Cir. 1994).  A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record.  *Leggett*, 67 F.3d at 564.  Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings."  *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted).  The Court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the" ALJ's decision.  *Id.*  Courts may not reweigh the evidence or substitute their judgment for that of the Secretary, however, and a "no substantial evidence" finding is appropriate only if there is a "conspicuous absence of credible

choices" or "no contrary medical evidence". *See Johnson*, 864 F.2d at 343 (citations omitted).

Here, after making a credibility finding regarding Plaintiff's alleged symptoms and limitations and reviewing "the objective medical evidence and other evidence," the ALJ determined that he had the RFC to perform medium work with the following restrictions: stand and walk for four of eight hours; sit for six of eight hours with a sit-stand option; never climb ropes, ladders or scaffolds; occasionally climb ramps and stairs; occasionally balance, stoop, kneel, crouch, and crawl; frequently handle, finger, and sense with his upper extremities; and limited to understanding, remembering, and carrying out simple work.  (R. at 18.)

### 1.    *Function-by-Function Analysis*

Plaintiff argues that remand is required because the ALJ erred by not performing "a function by function analysis of [his] work limitations" before assessing his mental RFC.  (Pl. Br. at 23–24.) He argues that the ALJ failed to incorporate the mental limitations she found in the psychiatric review technique into her RFC assessment and failed to "cite to any medical records that express[ed] an RFC."  (*Id.*)

When a claimant is found to have a mental impairment, the ALJ must determine its severity by evaluating "the degree of functional loss resulting from the impairment in four separate areas deemed essential for work." *Boyd v. Apfel*, 239 F.3d 698, 705 (5th Cir. 2001) (citing 20 C.F.R. § 404.1520a(b)(3)).  These areas are: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, and pace; and (4) episodes of decompensation.[5]    20 C.F.R.

---

[5]  These four functional areas are known as the "paragraph B criteria."  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00C.  The first three are rated on a five-point scale, as either none, mild, moderate, marked, or extreme, and the fourth is rated on a four-point scale, ranging from "none" to "four or more episodes."  *See* 20 C.F.R. § 404.1520a(c)(4) (2012).  If the first three functional areas are rated as "none" or "mild" and the fourth area is rated as "none," the impairment will generally be found not to be severe. *Id.* § 404.1520a(d)(1).

§ 404.1520a(c)(3) (2011); 20 C.F.R. Pt. 404, Subpt. P. App. 1, § 12.00C.  This rating process is known as  "the psychiatric review technique" or the "technique."  *Owen v. Astrue*, No. 3:10-CV-1439-BH, 2011 WL 588048, at *14 (N.D. Tex. Feb. 9, 2011).  If the mental impairment is severe but does not meet or medically equal a listed impairment, the ALJ must conduct an RFC assessment.  20 C.F.R. § 404.1520a(d)(3); *Boyd*, 239 F.3d at 705.

Before making an RFC determination, however, the ALJ must perform a function-by-function assessment of the claimant's capacity to perform sustained work-related physical and mental activities "based upon all of the relevant evidence" and taking into account "both exertional and nonexertional factors."  *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001) (citing Security Ruling (SSR) 96-8P, 1996 WL 374184, at *3–6 (S.S.A. July 2, 1996)).  "While the ALJ is not required to use the exact language from his psychiatric review technique, he must consider all of [the claimant's] limitations, including those found in the technique."  *Owen*, 2011 WL 588048, at *14.  Specifically, the ALJ must itemize the "various functions contained in paragraph[] B ..." and express them "in terms of work-related mental activities."  SSR 96-8P, 1996 WL 374184,  at *5–6.  These activities "include the abilities to: understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting."  *Id.* at *6; *see also* 20 C.F.R. § 404.1545(c) (2012).  "[W]ithout the initial function-by-function assessment of the individual's physical and mental capacities, it may not be possible to determine whether the individual is able to do past relevant work" at step four or perform other "types of work" at step five.  SSR 96-8P, 1996 WL 374184, at *3–4; *accord Myers*, 238 F.3d at 620.  Notably, even if the ALJ fails to conduct a function-by-function analysis, he satisfies this requirement if he bases his RFC assessment, at least

in part, on a state medical examiner's report containing a function-by-function analysis.  *Beck v. Barnhart*, 205 F. App'x 207, 213–14 (5th Cir. 2006) (per curiam); *Onishea v. Barnhart*, 116 Fed. App'x. 1 (5th Cir. 2004) (per curiam).

Here, after steps two and three and before proceeding to step four, the ALJ determined that Plaintiff's mental RFC was "limited to understanding, remembering, and carrying out simple work." (R. at 18.)  The ALJ did not conduct a function-by-function analysis of Plaintiff's mental work-related activities listed in SSR 96-8p and 20 C.F.R. §1545(c), and she did not rely a state medical or psychiatric consultant's function-by-function assessment because none was conducted.  The ALJ therefore committed error.  *See Owen*, 2011 WL 588048, at *15 (holding that the "ALJ committed error" in failing to perform a "detailed function-by-function analysis of [the claimant's] mental limitations in accordance with SSR 96–8p"); *Otte v. Comm'r, Soc. Sec. Admin.*, No. 3:08-CV-2078-P BF, 2010 WL 4363400, at *12  (N.D. Tex. Oct. 18, 2010), *recommendation adopted*, 2010 WL 4318838 (N.D. Tex. Oct. 27, 2010) (holding that the ALJ committed reversible error where "he made no narrative function-by-function assessment of [the claimant's] capabilities for work-related mental activities" but limited him only to "unskilled light and sedentary work"); *Bornette v. Barnhart*, 466 F. Supp. 2d 811, 815–16 (E.D. Tex. 2006) (finding error where the ALJ did "not incorporate a function-by-function assessment into his decision" but "only recited strength demands for light work generally").

### 2.  *Prejudice*

The Fifth Circuit has held that "[p]rocedural perfection in administrative proceedings is not required" and a court "will not vacate a judgment unless the substantial rights of a party are affected."  *Mays v. Bowen*, 837 F.2d 1362, 1363-64 (5th Cir. 1988).  "[R]emand for failure to

comply with a *ruling* is appropriate only when a complainant affirmatively demonstrates ensuant *prejudice*." *Bornette*, 466 F. Supp. 2d at 816 (citing *Hall v. Schweiker*, 660 F.2d 116, 119 (5th Cir. 1981)) (emphasis in *Bornette*). "[E]rrors are considered prejudicial when they cast doubt onto the existence of substantial evidence in support of the ALJ's decision." *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988). Accordingly, to establish prejudice warranting remand, Plaintiff must show that consideration of the functional limitations the ALJ found in the psychiatric review technique and the work-related mental activities listed in SSR 96-8p might have led to a different decision. *See Bornette*, 466 F. Supp. 2d at 816  (citing *Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir. 2000)).

a.      Psychiatric Review Technique

Plaintiff essentially argues that his claim was prejudiced because the ALJ did not consider and incorporate into her mental RFC assessment the functional limitations she found in the psychiatric review technique. (Pl. Br. at 23–24.)

The ALJ used the psychiatric review technique at steps two and three to find that Plaintiff was mildly restricted in activities of daily living and social functioning and moderately restricted in maintaining concentration, persistence, and pace. (R. at 17.) She explained that her RFC assessment "reflect[ed] the degree of limitation [she] ... found in the 'paragraph B' mental function analysis." (R. at 18.) Her RFC limitation to "simple work" may correspond to Plaintiff's moderate restriction in maintaining concentration, persistence, and pace; nothing in the RFC appears to account for his mild restrictions in activities of daily living and social functioning, however. (*See id.*) Nonetheless, the ALJ's narrative discussion shows that she did consider the paragraph B criteria in assessing Plaintiff's RFC. In activities of daily living, she explained that "[d]espite his allegations, [Plaintiff] testified that on a normal day he typically wakes up, showers, dresses

independently, drinks coffee, watches television, ... drives 'sometimes,' cleans his room, 'sometimes' takes out the trash, and tries to cook on occasion." (R. at 19.)  With respect to social functioning, she referenced his testimony that he "lives in a house with his mother and his wife" and his wife's testimony that he "leaves the house on occasion." (*Id.*)

Although the ALJ did not incorporate the "exact language" of her technique, she considered Plaintiff's paragraph B limitations when determining his mental RFC.  Plaintiff has therefore failed to show that he was prejudiced by the ALJ's failure to explicitly include her findings from the technique into her mental RFC or that remand is warranted. *See Bordelon v. Astrue*, 281 Fed. App'x 418, 422–23 (5th Cir. 2008) (per curiam) (to warrant remand, a claimant must show prejudice resulting from the ALJ's omission of the paragraph B limitations from the RFC and resulting hypothetical).

b.      Evidence of Plaintiff's Work-Related Mental Activities

Plaintiff also contends that remand is required because the ALJ's "decision does not cite to any medical records that express an RFC." (P. Br. at 24.)

In determining Plaintiff's mental RFC, the ALJ discounted Dr. Nguyen's February 1, 2010 GAF score of 45, explaining that Plaintiff "was not taking any medication at that time." (R. at 20, 955.) However, Dr. Nguyen's treatment notes from that date reveal that Plaintiff was taking Zoloft, an anti-depressant and during that consultation, she increased his dose from 50 to 100 milligrams. (*See* R. at 953.)  Dr. Nguyen discontinued Plaintiff's Trazodone because it did not alleviate his insomnia and prescribed him Restoril and told him to continue taking Benadryl. (*Id.*)  Notably, by June 8, 2011, Plaintiff's "current" GAF score was 45, and there is nothing in the record indicating that he was not compliant with his medication at that time. (*See* R. at 1076.)

The ALJ also noted that Plaintiff's medications resulted in "some improvement" with his depression and "mild improvement" with his insomnia.  (R. at 20–21.)  On the same day that he reported improvement with his depression, and on several occasions after that, Plaintiff's witnesses reported that he continued to be irritable and "easily agitated".  (*See* R. at 508, 512, 515.)  Although he was alert and oriented and his attention and memory were consistently found to be normal or intact, his insight, judgment, and impulse were consistently rated as only "fair."  (*See, e.g.*, R. at 952, 959, 1048, 1061, 1072, 1086.)  Metrocare treatment notes also reveal that he underwent several counseling sessions to develop and improve his problem-solving skills.  (*See* R. at 513, 522, 1058, 1088.)

On June 8, 2011, Dr. Megowen, Plaintiff's treating psychologist, completed the only medical source evaluation on file of Plaintiff's work-related mental activities.  (*See* R. at 1075–77.)  She opined that he had a "substantial loss of ability" in six work-related mental activities, including understanding and carrying out detailed but involved instructions, maintaining concentration for two hours, making simple work-related decisions, and responding appropriately to changes in a routine work setting.  (R. at 1075–77.)  She opined that he had an "extreme loss of ability" or "no useful ability" in six activities, including staying on task for two hours, performing at a consistent pace without an unreasonable number and length of rest periods, and accepting instructions and responding appropriately to criticism from supervisors.  (*Id.*)

While the ALJ's RFC limitation to "understanding, remembering, and carrying out simple work" could correspond to Plaintiff's "ability to understand, carry out, and remember instructions," neither her RFC finding nor her narrative discussion expressly address the other activities listed in SSR 96-8p.  Because the ALJ did not perform a function-by-function assessment, and did not rely

on an examiner's function-by-function report, it cannot be determined whether she addressed and incorporated Plaintiff's ability to perform the work-related mental activities listed in SSR 96-8p into her mental RFC and her hypothetical to the VE.  Had the ALJ addressed these activities and considered the relevant evidence, such as Dr. Megowen's assessment,[6] she might have imposed additional restrictions on Plaintiff's mental RFC.  Had the ALJ included those additional restrictions in her hypothetical to the VE, a different determination might have been reached as to Plaintiff's ability to perform the jobs of counter clerk, photocopy machine operator, and information clerk.

The ALJ committed error in failing to conduct a function-by-function assessment of Plaintiff's mental work-related functions before assessing his mental RFC.  This failure, coupled with the relevant evidence and the uncontradicted assessment of Plaintiff's treating physician indicating that he was substantially and extremely limited in some of those functions, casts doubt into the existence of substantial evidence supporting the ALJ's decision, given that their consideration might have led to a different decision of disability.  Accordingly, the case should be remanded for a full assessment of Plaintiff's mental RFC and new VE testimony addressing whether a significant number of jobs exist within his  physical and mental RFC.  *See Bornette*, 466 F. Supp. 2d at 816 (holding that the ALJ's failure to conduct a function-by-function assessment was prejudicial because the record contained evidence of additional impairments not addressed by the ALJ and "a court might conclude that the ALJ's failure to consider them ... may have skewed the [disability] result"); *see also Owen*, 2011 WL 588048, at *15 (remanding where the ALJ failed to

---

[6] Although Dr. Megowen's assessment was conducted after the ALJ rendered her decision and was submitted directly to the Appeals Council, this evidence is properly considered in deciding Plaintiff's motion for summary judgment because it is part of the administrative record.  *See Higginbotham v. Barnhart*, 405 F. 3d 332, 337–38 (5th Cir. 2005) (holding that the court "should have considered and addressed the new evidence ... submitted to the Appeals Council" because it "constitute[d] part of the record").

perform a function-by-function analysis and his mental RFC restriction to "minimal contact with the public, co-workers, and supervisors" failed to account for the "moderate limitation in concentration, persistence, or pace" that he had found in the technique).[7]

### III.   RECOMMENDATION

Plaintiff's motion for summary judgment should be **GRANTED**, Defendant's motion for summary judgment should be **DENIED**, and the case should be **REMANDED** to the Commissioner for further proceedings.

**SO RECOMMENDED, on this 7th day of March, 2013.**

_Irma Carrillo Ramirez_
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

---

[7] Plaintiff also argues, as part of his third issue, that the ALJ failed to follow "the mandate rule." (Pl. Br. at 24–26.)  Because remand is required on the "function-by-function analysis" issue, and because the resolution of this issue may affect the resolution of that issue as well as at least some of the remaining issues, the Court does not address them.

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).


IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

- 36 -